**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | **Crim. No.  23-CR-390 (DLF)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VALERIE SUE RUSHING** | ) | |
| | ) | |
| | ) | |

## <u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>

Believing at the time that the 2020 presidential election was wrought with fraud, Valerie Rushing decided to come to Washington, D.C. on January 6th, to "protest at the [W]hite [H]ouse." She arrived at the Capitol intending to exercise her constitutional rights.

Ms. Rushing walked from the rally to the Capitol as Trump encouraged his supporters to do. She entered the Capitol twice and spent a total of four (4) minutes inside. She was arrested months later and spoke with law enforcement twice. She had no plan, intention, or thought to take over the government on January 6th. She was not part of a militia group seeking to overthrow the government. She was charged more than 3 years later. Based on the nature and circumstances of the offense, her background, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of probation, which would be a sentence not greater than necessary to address her conduct in this case.

## <u>TIMELINE OF JANUARY 6th EVENTS</u>

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[1]  Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[2]  Antagonistic speech spread over the crowd of thousands.  At approximately 11 a.m., prominent Trump supporters encouraged the crowd to march to the Ellipse and fight.

An hour later, former President Trump took the stage and implored attendees to "fight" for him, notably stating:

| | |
|---|---|
| **<u>12 p.m.</u>** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[3] |
| **<u>1:10 p.m.</u>** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk |

---

[1]     Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[2]     George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[3]     *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

> down Pennsylvania Avenue. I love Pennsylvania
> Avenue. **And we're going to the Capitol**, and we're
> going to try and give.[4]

By this time, his supporters started heading towards the Capitol and started

fighting with the police.

| | |
|---|---|
| **12:54 p.m.** | Protestors breached the restricted perimeter line at Peace Circle on the West Front of the Captiol. |
| **1:10 p.m.** | Supporters "begin grappling with police on the Capitol steps." [5] |
| **1:30 p.m.** | After Trump's speech, "supporters being marching toward the U.S. Capitol."[6] |
| **2:11 p.m.** | Photographs indicate that supporters moved past the police lines on the west side of the Capitol and others scale the walls.[7] |
| **2:45 p.m.** | Ms. Rushing enters the Capitol, through the East Front House Door. |

Ms. Rushing left the building approximately 52 seconds later, at 2:45:59 p.m.

Less than two minutes later, Ms. Rushing reenters the building through the same

---

[4]      *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

[5]      Petras, *Timeline*, footnote 2 supra.
[6]      Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post, https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.
[7]      Petras, *Timeline*, footnote 2 supra.

door.  On May 26, 2021 and July 2, 2021, she agreed to speak to law enforcement without an attorney.

## LEGAL PRINCIPLES

Disorderly and Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three) and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four), are class B misdemeanors or "petty offenses", as defined by 18 U.S.C. § 3559(a)(7), because they individually carry a maximum incarceration period of six months or less.  The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors.  *See* U.S.S.G. §1B1.9.  In addition, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant."  Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."  *Id*. at (2)(A).  Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with

needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. at 2 (B-D).  Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

## ARGUMENT

Ms. Rushing is a hardworking 36-year-old plumber, who had a troubled upbringing but forged a stable and productive life for herself.  While the nature and circumstances of the January 6th events were indeed serious, her particular actions that day, paired with her individual history and characteristics do not lend itself to a sentence of incarceration.  Rather, a sentence of probation and restitution would meet the purposes of sentencing, without being overly punitive.  A probationary sentence would provide adequate deterrence to Ms. Rushing, avoid an unwarranted sentencing disparity among other January 6th defendants and is warranted in light of her stellar performance on pretrial release.

### I.   Nature and Circumstances of Ms. Rushing's Offense

Ms. Rushing understands and would never minimize the impact of the event on the nation.  Nor would she ever downplay her actions.  She recognizes that her presence contributed to the chaos on January 6th.  However, she was not the cause of January 6th, nor was she in the category of people who caused physical harm to others or damage to the Capitol buildings.  She entered the building, but her

unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day.  Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[8]  To characterize Ms. Rushing as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

Ms. Rushing traveled with her wife to Washington, D.C. to attend the rally. On Facebook, she explained that she had been following the news about the election and believed that "there was so much fraud[,] it's crazy."  Because of censorship, she wanted to stand up for her rights.  She sated, "I might not be able to do much to change anything[,] but I can still got [sic] to support."

---

[8]      *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

From: _____ Valerie Rushing

I don't know if u guys been fallowing everything but I have and from the things a seen and heard. If fucked up and there was so much fraud it's crazy. And the big Tex censoring is against my rights of freedom and free speech. So ya I want to go and stand up for what I think is right. I might not be able to do much to change anything but I can still got to support

12/23/2020 7:07:17 PM(UTC+0)

Source Info:
Meta SW Returns 973230000487007.zip/index.html : 0x0 (Size: 13767014 bytes)

It was clear that Ms. Rushing was planning to exercise her First Amendment rights.  Consistent with that, she brought an American flag.  She did not intend to harm anyone at the Capitol or overthrow the government.

At 2:44:53 pm, Ms. Rushing and her wife entered the Capitol through the East Front House Door.  This door had been opened by other protestors from the inside approximately two minutes earlier.  No law enforcement officers were present at this door.  See Exhibits A-C below.  Hence, Ms. Rushing did not push the door open. She simply walked in.



(Exhibit A)



(Exhibit B)



(Exhibit C)

It was later reported that Ashli Babbitt had been shot at 2:44 p.m.[9]  At

2:45:51 p.m., Ms. Rushing is seen in the Capitol as a crowd pours into the hallway

from the adjacent hall.  The crowd may have poured into the hallway because of the

shooting, but at this moment, it is unclear what anyone knew at that time.



(Exhibit D)


At 2:45:59 p.m., Ms. Rushing and her wife exit the building.

---

[9] Lisa Mascaro, Ben Fox, and Lolita C. Baldor, *'Clear the Capitol,' Pence pleaded, timeline of riot shows*, AP News, last updated April 10, 2021, available at https://apnews.com/article/capitol-siege-army-racial-injustice-riots-only-on-ap-480e95d9d075a0a946e837c3156cdcb9 (last accessed on August 5, 2024)



(Exhibit E)

Later, it appears that individuals become aware that a protestor had been shot inside the Capitol.  Protestors became angry and gathered at the door.  Some threw items into the building.  Ms. Rushing did not.  It appears that individuals enter the building again to find out what took place.  At 2:49:01 p.m., video shows Ms. Rushing's wife tugging Ms. Rushing into the building and about a minute later they enter the building.



(Exhibit F)



(Exhibit G)



(Exhibit H)

When Ms. Rushing and her wife enter the Capitol the second time, there do not appear to be law enforcement officers blocking the doors or ordering people out of the building. The scene is not chaotic.

As Ms. Rushing and her wife proceed further down the hallway, several individuals are yelling at law enforcement and calling them traitors. Ms. Rushing does not participate. At 2:54:24 p.m., Ms. Rushing and her wife peacefully leave the Capitol building. At no time did Ms. Rushing use her flag or even unravel it to demonstrate.



(Exhibit I)

Notably, by the time Ms. Rushing and her wife entered the Capitol, hundreds of people had already entered the building. During her interview with the FBI, Ms. Rushing was cooperative. She admitted to being at the Capitol and entering the building. She told them that she saw people trying to break windows and tried to tell them to stop. She offered to provide her video footage and agreed to be contacted again by law enforcement.

## II.   Ms. Rushing's History and Characteristics

Ms. Rushing had an "absolutely horrible" childhood. Her biological father had been in and out of prison. Her stepfather and mother abused her. See ECF No. 30, ¶ 51. She had an unstable lifestyle, where she and her family moved at least 50 times since her mother was trying to avoid being arrested by the authorities. Eventually, Ms. Rushing ran away from home and lived on the streets for a period

of time.  She was ultimately appointed a guardian ad litem.  When she was 17 years

old was able to move into her own apartment.

    Despite a difficult start in light, Ms. Rushing developed a stable life for

herself.  Her brother states that

> Valerie has overcome significant hardships, including a difficult
> childhood, to become a devoted stepmother, a homeowner, and an
> incredibly hardworking individual. She has demonstrated her
> generosity by providing free plumbing services to friends and
> community members and has rescued several birds, always striving to
> help those around her. Her commitment to others is well-recognized by
> her coworkers, friends, and neighbors.[10]

    Ms. Rushing has been working as a plumber for 17 years.  Her supervisor

explains that he has witnessed "her exceptional character, dedication, and

numerous talents."[11]  He states:

> One of Valerie's most admirable qualities is her ability to communicate
> effectively and build meaningful connections with those around her.
> She is a great listener and is always willing to offer support and
> encouragement to others. Her empathetic nature allows her to
> understand the perspectives of others and navigate interpersonal
> relationships with ease.[12]

She is a valuable asset to her his company, and he relies on her everyday.

    Ms. Rushing's coworker and friend Hernando also speaks highly of her

character:

> Shortly after moving here [in January 2020], I started work with
> Bayonet Plumbing in February of the same year. I began working with
> Valerie, who provided me with the training I needed to familiarize
> myself with the procedures and operations at the different subdivisions
> we work in. Our responsibility at work is doing the plumbing service
> for new construction to make sure the houses are move-in ready. I

---

[10] Character Letter by Robert Rushing, Exhibit 1.
[11] Character Letter by Thomas Eldert, Exhibit 2.
[12] *Id.*

began my new chapter in Florida with very limited resources, residing in a motel and struggling to make ends meet week by week. Despite some initial reservations, I eventually formed a friendship with Valerie.

Eventually after a while, I have had an opportunity to meet Amanda, who is now her wife. Both of these remarkable women have been incredibly supportive and helpful to me. They have provided support in ways that are difficult to articulate. Despite our age difference, they have welcomed me to their family with remarkable warmth and generosity. For instance, Valerie assisted me with moving into my current apartment, while Amanda has been attentive in caring for me and preparing dinner for me after work. Overall, these two individuals have done more for me than I could ever hope for from friends. Through my many years of life, i have realized that while many people can be called friends, only a few can be considered family.[13]

Due to her remorse, her background, and her performance on pre-trial supervision, a probationary non-incarceration sentence would be not greater than necessary to address her conduct in this case.

### III.    A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Incarceration is not required in order for a sentence to reflect the seriousness of the offense.  "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real

---

[13] Character Letter by Hernando Martinez, Exhibit 3.

conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

### IV.    A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Ms. Rushing.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public has been protected while Ms. Rushing has been on pretrial release. For the last nine (9) months, Ms. Rushing has complied with supervision requirements. The public will be protected while Ms. Rushing is being supervised by the Probation Officer, which will further deter any criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ.

16

School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions."). No incarceration is needed to deter criminal conduct in this case.

## V.   Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Ms. Rushing to probation would not contribute to an unwarranted sentencing disparity. Over 500 defendants have been sentenced in these cases.[14] A significant majority of the cases have been resolved as misdemeanor offenses. Defendants in other cases whose conduct was similar to Ms. Rushing's received probationary sentences. This Court has sentenced the following defendants to probation for walking and out of the Capitol building:

| Case | Plea & Sentence | Conduct |
|------|-----------------|---------|
| *U.S. v. Esther Schwemmer* 21-CR-00364 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant hurled insults at law enforcement officers and spent **15 minutes** inside the Capitol. ECF No. 29 at 4, 7 |
| *U.S. v. Edward McAlanis* 21-CR-00516 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant spent **15 minutes** inside. ECF No. 19 at 7 |
| *U.S. v. Lilith Saer* 22-CR-00374 | 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) 36 months' probation | • Defendant entered the Capitol building through the Senate Wing Doors, within 10 minutes of the violent breach and spent **6 minutes** inside the Capitol building. ECF No. 30 at 8 |

---

[14]     This estimate is based on the government's chart, filed in other cases.

| | | |
|---|---|---|
| *U.S. v. Patricia Todisco* 22-CR-00205 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant entered the Capitol through the Senate Wing Doors and spent **28 minutes inside**. ECF No. 53 at 10. |

Even in cases where the defendant not only walked in and out of the Capitol, but also encouraged others to enter the Capitol, deleted social media posts, and/or yelled at officers, (facts not present in this case), defendants have received sentences of probation.

| | | |
|---|---|---|
| *U.S. v. Michael Carico* 21-CR-00696 | 40 U.S.C. § 5104(e)(2)(G) 60 days home detention & 24 months' probation | • Defendant spent **52 minutes** in the Capitol, entered a few minutes after protestors broke inside; and deleted photos and videos he took on Jan. 6th . ECF No. 33 at 1-2 |
| *U.S. v. Gabriel Burress* 21-CR-00744 | 40 U.S.C. § 5104(e)(2)(G) 45 days home detention & 18 months' probation | • Defendant moved the metal barrier, waved others towards the Capitol, and spent **14 minutes** inside. ECF No. 46 at 8-16 |
| *U.S. v. Jordan Stotts* 21-CR-00272 | 40 U.S.C. § 5104(e)(2)(G) 24 months' probation | • Defendant shouted at police officers, scaled the wall on the Upper West Terrace, posted on social media, and spent **nearly 1 hour inside**.  ECF No. 24 at 1-6 |
| *U.S. v. Robert Snow* 22-CR-00030 | 40 U.S.C. § 5104(e)(2)(G) 12 months' probation | • Defendant entered the Capitol two minutes after the breach, waved people inside, spent **43 minutes inside**, and made his way to the 3rd floor of the building where many staff offices were located.  ECF No. 26 at 1-2 |

18

In cases where defendants received 14 days incarceration (less than half of the government's request in this case), the defendant's conduct was far worse than Ms. Rushing's.  In *United States v. Paul Lovely*, 23-CR-00019, the defendant was associated with a right-wing group and decided to travel to the Capitol with four other individuals.  The group entered the Senate Wing doors three minutes after the doors were breached.  They proceeded through the Crypt and down to the hall of the Office of the Clerk and Office of the Majority Leader and entered Nancy Pelosi's conference room.  The defendant also stood by as one of the members of his group attempted to assault an officer by "ramm[ing] a bicycle rack into an officer."  ECF No. 53 at 1-12.  The defendant pled guilty to 40 U.S.C. §§ 5104 (e)(2)(D) and (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In *United States v. Victor Martinez*, 23-CR-39-TSC, the defendant led a small group of protestors and pushed his way into the Capitol, celebrated entering the building, recorded violent scuffles between police and protestors, and spent 50 minutes inside the Capitol.   During a later FBI interview, the defendant minimized his conduct on January 6th.  ECF No. 21 at 1-21.   The defendant pled guilty to 40 U.S.C. § 5104 (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In *United States v. Dusty Higgins*, 23-CR-59-RDM, the defendant recorded a video of himself entering the building through a broken window and posted messages on Instagram.  The defendant expressed to another individual that he

wanted to open a Proud Boys chapter, and his posts on social medial included Three Percenter logo and images. The defendant pled guilty to 40 U.S.C. § 5104 (e)(2)(G) and was sentenced to 14 days of intermittent confinement and 36 months of probation.

In other cases, where defendants pled to the more serious misdemeanor (18 U.S.C. § 1752), they received probation. *See United States v. Rachel Pert*, Crim. No. 21-cr-00139 (sentenced to 24 months' probation); *United States v. Jeffrey Witcher*, Crim. No. 21-cr-00235 (12 months' probation); *United States v. Nicholes Lentz*, Crim. No. 21-cr-00053 (1 month home detention and 36 months' probation).

The 1752 defendants who received intermittent confinement as a part of probation had more egregious than Ms. Rushing.  In *United States v. Blake Reed*, Crim. No. 21-cr-204-BAH.  Reed discussed joining the Proud Boys.  ECF No. 171, p.2.  He posted a video of the crowd marching toward the Capitol which included the threat "we are coming for you."  *Id.*  He wore protective gear "to ward of[f] officers' attempts to protect the Capitol."  *Id.* at 3.  Ms. Rushing did not.  Reed encouraged his co-defendant to remove evidence.  Ms. Rushing did not.  Reed took steps to conceal electronic evidence on his phone.  Ms. Rushing did not.  Reed appears to have mocked law enforcement after the execution of the search warrant.  Id. at p. 25.  Ms. Rushing did not.  Reed received 42 days of intermittent confinement as part of his probationary sentence.  Ms. Rushing's conduct was far below Reed's conduct.  Hence, she should not receive a sentence of incarceration.

In *United States v. Schornak*, 21-cr-278, the defendant received a sentence of 28 days of intermittent confinement and a term of probation.  In that case, Schornak "traveled to the Visitor's Center and stole an American flag."  *Schornak*, 21-cr-278, Gov't Sent. Memo, ECF 62, p. 11.  Ms. Rushing did not steal anything. Schornak boasted about stealing the flag and causing tyranny inside the Capitol and he was "damn proud of it."  Id. at 16.  Ms. Rushing did not.

Ms. Rushing's conduct was less egregious than other cases where defendants received probation.  For example, in *United States v. Jackson Kostolsky*, 21-cr-197, a 40 U.S.C. § 5104(e)(2)(G) case, the defendant "scaled the wall to get to the Upper West Terrace," was tear-gassed,  and entered the Capitol through the Parliamentarian doors soon after it was breached.  He also deleted videos from his phone.  These facts are not present in Ms. Rushing's case.

Of the factors that the government deems to be critical in these cases, most of them are mitigating factors in Ms. Rushing's case.  First, when she entered the Capitol, she did not break any windows to gain entry.  Second, Ms. Rushing did not encourage violence.  Third, she did not encourage property destruction.  Fourth, there is no evidence of significant reaction to violence or destruction.  Fifth, during or after the riot, she did not destroy evidence.  Sixth, Ms. Rushing was inside the building for a relatively brief amount of time, and she did not enter the Senate or House chambers where members of Congress were gathering to certify the election. Seventh, she did not make any notable posts on social media.  Eighth, she has accepted responsibility and demonstrated remorse.

## **Conclusion**

Considering the § 3553(a) sentencing factors, a probationary sentence and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500